# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARC FISHER

       Plaintiff,

v.

COUNTY OF MACOMB, a Municipal
Corporation, MACOMB COUNTY
SHERIFF'S DEPARTMENT, a duly
organized Government Department of
Macomb County, SHERIFF MARK A.
HACKEL, an individual and Elected
Sheriff of Macomb County, CORRECTIONAL
MEDICAL SERVICES, INC., a Michigan
Corporation, and JOHN DOES 1-10, various
unnamed Macomb County Correctional and
Law Enforcement Officers and Deputies,

       Defendants.

_____/

Case Number: 2:08-cv-13844

Paul D. Borman
United States District Court

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendant County of Macomb's ("Macomb County" or the "County") motion for summary judgment (Dkt. No. 38) and Defendant Correctional Medical Services, Inc.'s ("CMS") motion for summary judgment (Dkt. No. 48). Plaintiff has filed a combined response to both motions. (Dkt. No. 56.) Defendant CMS has filed a reply brief (Dkt. No. 58), Macomb County did not. In his response, Plaintiff agreed to dismiss Defendants Macomb County Sheriff's Department and Sheriff Mark A. Hackel. (Pl.'s Combined Resp. to Defs.' Mot for Summ. J. 10.) Oral arguments were heard on May 20, 2011. For the following reasons the Court GRANTS Defendants' motions for summary judgment.

1

## I.      Background

This action arises from Plaintiff Marc Fisher's ("Plaintiff" or "Fisher") claims against Defendants Macomb County, CMS, and John Does 1-10 for violations of his constitutional rights under 42 U.S.C. § 1983, gross negligence, assault and battery, and intentional infliction of emotional distress stemming from a seizure he suffered on January 11, 2008 at around 8:15 p.m. – one day after he was incarcerated in the Macomb County Jail (the "MCJ").

### A.      The Parties

Macomb County operates the MCJ; CMS is a private corporation that the County contracts with to provide medical services to inmates; and John Does 1-10 are various MCJ deputies and CMS employees.   Although all of the John Does in Plaintiff's Complaint remain unidentified, the parties have identified several individuals whose conduct is crucial to Plaintiff's claims.  Debra Holmes was the CMS nurse who was working intake when Plaintiff arrived at the MCJ and performed his initial medical screening.  Dr. Ernesto Bedia, the MCJ's only medical doctor, examined Plaintiff at 1:40 p.m the day of the seizure.  Nurses Raymond Sellman and Kyra Busby were working in Plaintiff's area, D-block, when inmates reported Plaintiff was having a seizure.  Deputy Brandon Cleland was a deputy working in D-block that night.  Cleland, Sellman, and Busby all responded to Plaintiff's seizure at the same time.

### B.      Plaintiff's Medical and Criminal History

Plaintiff is an epileptic.  (Pl.'s Resp. 1.)  He was diagnosed with epilepsy when he was seven years old.  Since then, he has constantly taken prescription medication for his condition.  Plaintiff has been prescribed two daily medications, Tegretol XR and Keppra, to help control his seizures. In November 2002 or 2003, Plaintiff failed to obtain a new prescription for his medications because

2

he did not have enough money to buy them.  After missing only one day's worth of his medications, Plaintiff suffered a seizure while driving his car.  (Pl.'s Resp. Ex. 1, Deposition of Marc Fisher 33:23-34:7, Apr. 14, 2009.)

Over the years, Plaintiff's doctors have steadily increased his dosages for both Tegretol and Keppra, despite periodic unsuccessful attempts to lower his dosage.  Plaintiff's current neurologist Dr. Martin Belkin stated in an affidavit that as early as August 20, 2007 he had prescribed Plaintiff 1000 mg of Tegretol twice a day, and 500 mg of Keppra twice a day.  (Pl.'s Resp. Ex. 2, Affidavit of Dr. Martin Belkin ¶ 7, Feb. 10, 2010).

In January 2008, Plaintiff violated his probation from an earlier misdemeanor conviction for marijuana possession and was ordered to be locked up in the MCJ in January 2008 to serve the remaining 60 days on his original 90-day sentence.  (Pl.'s Resp. 1.)  On January 10, 2008, Plaintiff was taken into custody and transported to the MCJ.  (Def. Macomb County's Br. in Supp. of its Mot. for Summ. J. 1.)

  **C.**  **Events Leading Up to the Seizure**

When Plaintiff was taken to the MCJ, Nurse Holmes conducted his mandatory medical screening.  Although the intake form signed by both Holmes and Plaintiff indicates that Plaintiff did not report any serious medical issues or that he was taking any medications, at some point Plaintiff told Holmes that he was an epileptic and took Tegretol and Keppra twice daily, although he had not taken either medication that day or brought any prescriptions with him.  (Fisher Dep. 68:2-69:22.) Plaintiff also indicated that he had previously been incarcerated in the MCJ in 2006.

Pursuant to CMS policy, Holmes attempted to verify that Plaintiff had a current prescription for the medications he claimed he needed.  Holmes asked Plaintiff what doctor prescribed him the

drugs and what pharmacy he filled them at.  The record does not demonstrate whether Plaintiff told Holmes that his doctor was Dr. Belkin, but he did tell her that he filled his prescriptions at the Costco on Hall Road in Shelby Township.[1]  When she contacted Costco, however, she learned that Plaintiff had last filled his Tegretol on October 26, 2007 and his Keppra on July 26, 2007.  On those dates he received 12 days' worth of Tegretol and 30 days' worth of Keppra, respectively.  Because Holmes believed that this indicated Plaintiff did not have a current prescription as required, Holmes contacted Dr. Bedia.  He instructed her to have Plaintiff sent to his clinic the next day so he could evaluate him and determine whether it would be appropriate to prescribe him Tegretol and Keppra.  Holmes followed these instructions and also ordered Plaintiff to be placed on a lower-bunk, which is a standard practice for inmates at risk of suffering seizures.

Plaintiff claims that during his screening with Nurse Holmes, he told her that he needed his medication immediately or there was a very good chance he would suffer a seizure.  He claims that Holmes told him that he could go 48 hours without his medicine.  (Fisher Dep. 69:21-70:11.)  When he told her he cannot wait that long, Holmes allegedly said "I am a nurse, if I recall correct, you can go 48 hours."  (*Id.*)  Plaintiff also claims that afterwards he told every deputy that walked by his cell that he needed his medication or he would have a seizure.  (*Id.* at 53:1-6.)  He claims that he told them that he needed his medication for Tegretol and Keppra for his epilepsy, that the jail had it on record from before, and that he could not go for a period of time without it.  (*Id.*)  He admits, however, that no officers acknowledged his comments by verbally responding or even making eye

---

[1] In his deposition, Plaintiff also explained that he sometimes "calls around" to find a cheaper deal on his prescriptions, although he has not done that in a while.  (Fisher Dep. 34:19-35:25.)  There is no evidence that Plaintiff informed Nurse Holmes of this practice.  Furthermore, when asked whether he would have last filled his prescriptions before January 2008 at Costco, he replied "[y]es, I go to Costco."  (*Id.* at 154:2-8.)

4

contact, and he does not know their names. (*Id.* at 54:21-55:5.) That first night at the MCJ, on January 10, Plaintiff fell asleep without any difficulty or incident. (*Id.* at 85:5-7.)

The next day, January 11, 2008, Plaintiff was evaluated by Dr. Bedia at 1:40 p.m.[2] Plaintiff still had not been given his medication, but during his examination Dr. Bedia determined that Plaintiff was suffering from a seizure disorder and prescribed him both Tegretol and Keppra at the same dosages he was previously taking. Accordingly, Plaintiff was scheduled to receive both drugs at the next medication pass that night at 10:00 p.m. At the MCJ, medication is passed out at 10:00 a.m. and 10:00 p.m. unless special arrangements are made. Dr. Bedia testified that he did not think it was necessary to make sure Plaintiff was given his medications immediately on January 11 because he did not seem like he was having a problem. Plaintiff's vital signs were stable, and there were no noticeable symptoms of an aura – a sign of an impending seizure.

### D.   Defendants' Response to the Seizure[3]

That night, on January 11, Plaintiff went to sleep without any problems sometime in the evening. Unfortunately, at around 8:15 p.m. Plaintiff suffered a seizure. Nurses Sellman, Busby and Deputy Cleland rushed to Plaintiff's cell when they heard other inmates shouting that someone was having a seizure. Busby, Sellman, and Cleland said that when they arrived, Plaintiff was on a lower bunk with other inmates around him. At some point Cleland stated that he saw Plaintiff

---

[2] At his deposition, Plaintiff did not believe he saw a doctor that day, (Fisher Dep. 93:1-7). Dr. Bedia's report was dated January 11, 2008 and the time written down was 1:40. (CMS's Br. Ex. A, at 17.) In his brief, Plaintiff does not seem to dispute that he saw Dr. Bedia on January 11. (Pl.'s Resp. 5.)

[3] Plaintiff testified that he does not remember anything that happened at the MCJ after he fell asleep in the evening on January 11 and went into his seizure. He claimed that the next thing he knew he woke up at Mount Clemens General Hospital. (Fisher Dep. 84:18-85:4, 99:19-25.)

5

standing, but it was unclear when that was. After clearing away the other inmates, Nurses Sellman and Busby lowered Plaintiff from the bed to the floor. Sellman, Busby, and Cleland all testified that in their opinion Plaintiff was not having a seizure when they arrived, because, as Nurse Busby explained, Plaintiff was alert, yelling, had enough control over his motor skills to grab things, was not sweating, and he was not shaking. Traditionally seizure victims are in a postictal state, tired, snoring, unable to communicate, and sweaty. (Pl.'s Resp. Ex. 5, Deposition of Kyra Busby 25:14-28:24, Nov. 10, 2009.)

All three employees testified that as Sellman and Busby attempted to assess Plaintiff's condition, Plaintiff reached up and grabbed Sellman's arm or wrist. After Sellman broke free from his grip Plaintiff again sat up and grabbed Sellman's shirt by the neck. Busby testified that Plaintiff was thrashing and yelling profanities. At one point she also said "he tried to swing on me as I'm trying to get his blood pressure." (*Id.* at 28:11-24.) In Nurse Sellman's report written immediately following the incident, he noted "[Plaintiff] grabbed my R wrist. At first, I pulled away and tried to ask him some questions, at which point he sat up, grabbed my shirt by the neck, and my R arm and began fighting me." (CMS's Br. Ex A, at 7.) In her written report, Nurse Busby stated "[inmate] was extremely combative." (*Id.*, at 6.)

When Plaintiff grabbed Nurse Sellman, Deputy Cleland radioed that he needed more officers in D-block. In less than a minute, several officers (Cleland said probably around five or six) arrived at the cell to assist Cleland. When the officers came in, both nurses stepped out of the cell. Because in Cleland's opinion Plaintiff had assaulted Nurse Sellman and because he was being combative, the officers attempted to handcuff his arms behind his back. Plaintiff, however, allegedly resisted and did not follow their commands. In order to "gain control" over Plaintiff, Cleland executed four or

6

five common peroniel knee strikes, striking Plaintiff in the peroniel nerve that runs along the outside of his leg. Cleland explained that this tactic is a pain compliance technique to get the inmate to follow an officer's commands. Neither Busby, Sellman, or Cleland saw any other officers kick, punch, or strike Plaintiff.[4] After a few minutes, the officers were able to handcuff Plaintiff and take him down to the medical unit. An ambulance was also called. While waiting for the ambulance in the medical unit, Nurse Busby and Cleland reported that Plaintiff "remained combative" and "continued to fight with officers." (CMS's Br. Ex. A, at 6; Pl.'s Br. Ex. 11.)

The ambulance arrived a short time later and transported Plaintiff to Mount Clemens General Hospital at 8:30 p.m. (CMS's Br. Ex. A, at 36.) Plaintiff was taken out of his handcuffs to be placed in the ambulance, but then was re-handcuffed to the stretcher. When he was handcuffed to the stretcher, Cleland had time to make sure they were "spaced and locked," which means that there is room for an officer to get a finger in between the cuffs and the inmate's wrist (spaced) and double locked so the prisoner cannot accidentally tighten them (locked). (Macomb County's Br. Ex. B, Deposition of Brandon Cleland 53:10-16, Nov. 20, 2009.) On the form Nurse Busby gave to the EMS personnel before the ambulance left, she again noted that Plaintiff had been "extremely combative" and that she was unable to obtain his vital signs because of that. (CMS's Br. Ex. A, at 36.) That Plaintiff was being combative was corroborated by the ambulance staff's decision to "chemically restrain" Plaintiff with Ativan, a benzodiazepine used to treat anxiety. (CMS's Br. Ex.

---

[4] In his deposition, Plaintiff testified that when he was returned to the MCJ after being released from the hospital "everybody" told him he had been beaten by the guards. (Fisher Dep. 102:23-103:9.) He said cellmates told him they had never seen someone get beat like that before. (*Id.* at 104:15-105:7.) These allegations, however, are hearsay and therefore not admissible. Plaintiff has not introduced any affidavits or deposition testimony from any of these alleged witnesses even though he and his lawyer obtained about half a dozen of their names and other information. (*Id.* at 105:1-106:20.)

7

C, Mt. Clemens Gen. Hosp. Records, at 7.)  Additionally, Mt. Clemens staff noted in Plaintiff's ER Report that "[u]pon his arrival, the patient was verbally as well as physically combative with staff." (*Id.*, at 6.)

At the hospital, Plaintiff was given his medications which returned his Tegretol levels to the therapeutic range.  He also received a full work-up including CT scans, blood tests, and x-rays. With respect to the nerve damage in his wrists of which he now complains was caused by Cleland's use of force, the ER Report states that Plaintiff "denied lightheadedness, dizziness, or headache.  He denied having hit his head.  He denies neck pain, back pain, shortness of breath, chest pain, abdominal pain, calf pain, or other complaint." (*Id.*)  An examination of Plaintiff when he arrived at the hospital revealed that he had "[n]o abrasions, lacerations, or rashes.  No other sign of trauma." (*Id.*, at 7.)  On January 12, 2008 at around 2:00 p.m., another form was filled out – an ER Documentation. (*Id.*, at 48.)  In the neurological section it stated "[m]otor stength to all extremities are strong and equal" and "[p]atient moves all extremities." (*Id.*, at 48 & 49.)

When Plaintiff was returned to the medical ward at the MCJ, he had a conversation with Cleland during which he held out his hands and said "you guys didn't have to do this to me" – referring to his wrists which were bruised. (Cleland Dep. 55:15-24.)  After leaving the MCJ, Plaintiff went to Henry Ford Macomb Hospital on 19 Mile between Hays and Garfield for further testing. (Fisher Dep. 117:17-25.)  On January 22, 2008, a radiologist at Henry Ford interpreted four x-rays of each of Plaintiff's wrists.  (CMS's Br. Ex. E.)  In each wrist he reported "no acute fracture," no dislocation,  no signs of gross soft tissue, and no bony destructive process. (*Id.*, at 9 & 10.)  The doctor also took four x-rays of Plaintiff's left elbow and found he had "[p]robably small spur rather than a chip fracture of the coronoid process.  Correlate with point tenderness." (*Id.*, at

8.) When Plaintiff was discharged, his Patient Visit Summary indicated under Injury/Illness that he had a contusion on his upper extremity.  (*Id.*, at 14.)

### E.    Plaintiff's Claims

Plaintiff claims that Macomb County, CMS, and several John Doe Defendants were deliberately indifferent to his serious medical needs – in particular the risk of seizure he faced if he did not receive his medications.  Plaintiff also alleges that the County's policies, practices, or customs regarding its supervision and training of its employees caused them to not give him his medicine in a timely manner, which ultimately caused him to have a seizure.  In addition, Plaintiff has brought state-law tort claims for gross negligence, assault and battery, and intentional infliction of emotional distress.  Through their two motions Defendants have asked this Court to grant them summary judgment on all of Plaintiff's claims.

## II.    Standard of Review

Summary judgment is only appropriate if there are no genuine issues of material facts and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *see also Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006).  When applying this standard, courts must view all materials, including all of the pleadings, in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the responsibility of establishing no issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its burden, the

non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *Id.* at 324. The non-moving party must do more than show that there is some abstract doubt as to the material facts. It must present significant probative evidence the issue exists in order to defeat a motion for summary judgment. *See Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

**III.    Discussion**

**A.    Policies, Practices, and Customs**

A plaintiff may bring a § 1983 claim against a municipality or local government. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To prevail in such a suit, the plaintiff must show that the alleged violation of his federal rights was caused by a municipal policy or custom. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *see also Monell*, 436 U.S. at 692 (stating that the drafters of § 1983 intended only to impose liability on a government that "causes" an employee to violate another's rights under color of some official policy). A plaintiff asserting a § 1983 claim on the basis of municipal custom or policy must identify the policy, connect the policy to the municipality, and show that the specific injury at issue was caused by the execution of that policy. *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). The causal link must be strong enough to support a finding that the defendants' deliberate conduct can be deemed the "moving force" behind the violation. *Id.* (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

In *Thomas*, the Sixth Circuit identified four ways a plaintiff may prove the existence of an illegal policy or custom. 398 F.3d at 429. The plaintiff can point to (1) the government's legislative enactments or official policies; (2) actions by officials with final decision-making authority; (3) a

policy of inadequate training or supervision; or (4) a custom or practice of tolerating the violation of federal rights by its officers or agents. *Id.* Where no formal policy exists, the critical inquiry is whether there is a policy or custom that although not explicitly authorized "is so permanent and well settled as to constitute a custom or usage with the force of law." *Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010) (quoting *McClendon v. City of Detroit*, 255 F. App'x 980, 982 (6th Cir. 2007)). A municipality cannot be held liable pursuant 42 U.S.C. § 1983 on a theory of *respondeat superior*. *Monell*, 436 U.S. at 691-95; *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

Plaintiff's claims against both Defendant Macomb County and Defendant CMS are analyzed under these general rules. CMS is treated as a municipality for purposes of liability under § 1983 because *Monell*'s holding extends to private corporations as well. *See Street Corr. Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996) (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992)). Plaintiff's allegations against each of these entities will be addressed in turn.

### 1. CMS

First, the Court notes that as part of his claims Plaintiff attempts to hold CMS liable for the alleged constitutional violations and/or negligence of its employees/contractors, Nurse Holmes and Dr. Bedia. (Pl.'s Resp. 12.) Vicarious liability on the theory of *respondeat superior*, however, is categorically not permitted under 42 U.S.C. § 1983. *Monell*, 436 U.S. at 691-95; *Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). As a result, Plaintiff must prove that a specific CMS policy, custom, or practice was the "moving force" behind his injuries. *Graham*, 358 F.3d at 383. Plaintiff claims that "CMS's custom of refusing inmates prescription medication for 48 hours constitutes deliberate indifference to Plaintiff's medical needs." (Pl.'s Resp.

11

12.)

Plaintiff, however, mis-characterizes the CMS policy at issue in this case.  Plaintiff has presented no evidence that CMS has a custom of categorically refusing inmates prescribed medication for 48 hours.  Rather, as Nurse Busby explained, CMS policy is to ask all inmates whether they are currently taking any prescribed medications during an intake interview.  (Busby Dep. 11:7-14:2.)  If an inmate claims that they brought their medicine with them, CMS policy is to go into the inmate's property to make sure that they have a current prescription for the medications, that the medicine they brought with them is actually the medicine they have been prescribed, and then they still call the doctor to make sure he wants the medicine prescribed.  (*Id.*)   Dr. Bedia testified that it would not be unusual for a nurse to call him at his office or at home to get an order for a medication the inmate is required to take daily.  (Pl.'s Resp. Ex. 12, Deposition of Ernesto Bedia 19:18-20:8, Jan. 7, 2011.) After all of that, inmates are still not necessarily permitted to take the medication they brought with; CMS policy is to treat prisoners from stocks of medicine the MCJ has on-hand until more can be obtained from the pharmacy.[5]  (Busby Dep. 11:7-14:2.)  The MCJ keeps both Tegretol and Keppra on-hand.  (*Id.*)

If an inmate tells the nurse they take medication but do not have any with them, Busby testified that "we ask them which pharmacy they go to or what doctor they get their prescription [from], and then we are to call the doctors or the pharmacy to get the medication verified."  After the medication is verified, the nurse calls the doctor to get the medicine ordered.   "It's up to our doctors to put them on that or if they want to put them on different medicine."  (*Id.*)  Nurse Valerie

---

[5]  Exceptions are made for rare medications not kept in stock at the MCJ, such as chemotherapy drugs.  (*Id.*)

Watkins, CMS's director of nursing, testified that pharmacies are generally contacted within 24 hours to verify an inmate's prescription. (CMS's Br. Ex. G, Deposition of Valerie Watkins 19:6-8, Nov. 20, 2009.) If an inmate says that it is a critical medication, however, "and [the inmates] give us the correct information and we can verify that, then we act accordingly." (*Id.* at 19:9-16.) If a medication cannot be verified, then the inmate is put on the doctor's list and they will see the doctor within 24 hours, usually the next day unless the doctor is still around the prison or it is an emergency where the prisoner is in trauma. (Busby Dep. 12:14-13:4; Watkins Dep. 23:3-9.)

Even if a medication is verified, it still has to be prescribed by CMS's doctor. (Watkins Dep. 22:1-23:9.) If a medication is verified and confirmed that it is current, the intake nurse can simply call the doctor and get an order. (*Id.*) This would be the procedure applied if a prisoner said he needed his medicine within 24 hours. (*Id.*) If the medicine is not urgently needed, the inmate will be seen by the doctor, who can then prescribe the medication, within 72 hours. (*Id.*) Indeed, Plaintiff testified that when he was incarcerated in the MCJ in 2006, "they confirmed that [he] actually needed the medication" that was sent with him from home. (Fisher Dep. 21:16-22:11.)

In order for prescriptions to be considered verified, Nurse Watkins explained that the inmate had to have a *current* prescription. (Watkins Dep. 26:19-20.) Although some nurses have called the physician given by the inmate as his doctor to verify prescriptions, Watkins testified that policy still requires evidence that the prescription is current from the pharmacy. (*Id.* at 28:15-30:4.) To determine whether a prescription is current, nurses are supposed to check when the inmate last filled the prescription and how much medicine they were given on that occasion. (*Id.*) Watkins stated that something is not current if the inmate should have run out of medicine 2-3 months ago. (*Id.*)

All inmates who disclose that they suffer from a chronic illness will be seen by Dr. Bedia

13

in the chronic care clinic.  (*Id.* at 37:1-13.)  If an inmate tells an intake nurse that they have a chronic medical condition and their medications cannot be verified, that inmate will be scheduled to see the doctor the next day at the latest.   (*Id.*)   If their medicine has been verified and consequently prescribed by the doctor, the inmate will be seen at the chronic clinic within 10-14 days.  (*Id.*)

When an inmate is directed to see Dr. Bedia because a prescription cannot be verified, he evaluates the prisoner to determine whether to prescribe the medication the inmate alleges he needs. During this evaluation, the doctor would normally look at the prisoner's past medical records if they are available.  (Bedia Dep. 25:21-24.)  The doctor fills out a "Problem List" that identifies any medical issues or information discovered during the evaluation.  (*Id.* at 31:10-25.)  When a patient is prescribed a medication during clinic hours they are first given that medicine, if appropriate, at the next medication pass unless the doctor specified that he needed them sooner.  (Watkins Dep. 48:7-49:5.)  Medication passes occur at 10:00 a.m. and 10:00 p.m.  (*Id.*)

When responding to a seizure, Nurse Busby testified that CMS policy is to bring an emergency bag, an EKG machine, and usually another nurse will bring a wheelchair to the scene of the incident.  (Busby Dep. 19:15-20:1.)  If an inmate is still actively having a seizure, protocol is to lower them to the ground, place them on their side and protect their head as much as possible.  (*Id.* at 20:6-7.)  If the seizure appears to be over when the nurses arrive, nurses are supposed to try to assess the inmate's vital signs and make sure they have an open airway, are breathing, and have a pulse.  (*Id.* at 20:8-11.)

The Court finds that Plaintiff has not raised an issue of material fact as to whether or not these policies were the "moving force" behind Plaintiff's injuries.  Every policy appears to be part of a reasonable and safe way of medically processing and treating inmates.  Furthermore, the

policies provide flexibility to the medical health professionals who implement them to respond immediately to emergency situations.  While Plaintiff may argue that the individual Defendants carried them out in a negligent or deliberately indifferent manner, such accusations cannot sustain a claim against CMS under *Monell*.  *See Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quoting *City of Canton v. Harris*, 489 U.S. 378, 391 (1989)) ("There can be no municipal liability where an otherwise sound program has occasionally been negligently administered.") (quotation marks omitted).

### 2.    Macomb County

Plaintiff alleges that Macomb County failed to "properly train, educate and supervise prisoner intake personnel including prisoner intake nurses and physicians, sheriff's deputies, officers and other persons having custody and control over prisoners with respect to epileptic seizures[.]" (Compl. ¶ 64a.)  Plaintiff also accuses Macomb County of recklessly hiring employees (*id.* ¶ 64f), failing to discipline, instruct, and supervise officers "thereby encouraging acts and omissions that contributed to Mr. Fisher's epileptic seizure" (*id.* ¶ 64g), and "failing to have appropriate safeguards, procedures and policies in place to avoid and prevent restraining Mr. Fisher while he was experiencing a painful and traumatic seizure by placing restraints on Mr. Fisher's wrists with his hands and arms restrained behind his back–all in direct violation of the standard protocol in handling persons suffering from an epileptic seizure" (*id.* ¶ 64e).  In its response, however, Plaintiff only continues to claim that Macomb County is not entitled to summary judgment because questions of fact exist as to whether it provided adequate training regarding the use of restraints on inmates who just had a seizure, and whether Deputy Cleland was deliberately indifferent to Plaintiff's serious medical needs when he struck and handcuffed him after he suffered a seizure.  (Pl.'s Resp. 10-11.)

15

### a.   CMS Defendants' Actions

First, the Court notes that Dr. Bedia works for CMS and is an independent contractor for the MCJ. (Bedia Dep. 14:15-16.) He and the rest of the CMS staff are responsible for all of the medical decisions made with respect to the inmates at the MCJ. (*Id.* at 55:12-17.) In another case involving Macomb County's liability due to the actions of CMS and Dr. Bedia, the Michigan Court of Appeals stated "Plaintiff must show that Macomb County's policy to contract with CMS was the moving force behind treatment to decedent that was deliberately indifferent to his serious medical needs." *Hartzell v. City of Warren*, No. 252458, 2005 WL 1106360, at *8 (Mich. App. May 10, 2005).

Although the court held that summary judgment for Macomb County was appropriate because the plaintiff could not establish any of the CMS defendants were deliberately indifferent on their own, the court also noted that even if that was not the case, summary judgment for Macomb County would still be appropriate because "plaintiff has presented nothing to support his claim that the alleged constitutional violation occurred because of the execution of Macomb County's policy to rely on CMS for its inmate's medical care. *Id.*, at *8 n.4.

The *Hartzell* court relied heavily on the Sixth Circuit's decision in *Graham*, 358 F.3d at 384. In *Graham*, the court stated that "it is not unconstitutional for municipalities and their employees to rely on medical judgments made by medical professionals responsible for prisoner care." *Id.* (quoting *Ronayne v. Ficano*, No. 98-1135, 1998 WL 183479, at *3 (6th Cir. Mar. 15, 1998)) (quotation marks omitted). There the plaintiff asserted that Washtenaw County was liable for having a policy of deferring to the medical decisions of SecureCare, a private company. The court held that even if Washtenaw's policy was to defer absolutely to SecureCare employees' decisions, and even if that permitted nurses to make medical decisions that Michigan law did not permit them to make,

16

"those alleged defects are insufficient to hold the County liable for the alleged constitutional violation in this case." *Id.* In fact, the Sixth Circuit praised the county's policy of outsourcing the medical treatment of prisoners, finding that it allowed for the provision of prompt health care from on-site professionals and ensured that an independent party was making critical decisions regarding inmates' medical needs. *Id.* As in *Graham* and *Hartzell*, the Court holds that Macomb County cannot be held liable for the actions or omissions of CMS's staff or its policies. The Court's analysis for the remaining claims against Macomb County assumes that they apply only with respect to the MCJ deputies or corrections officers.

### b.      Failure to Train/Supervise

To succeed on a failure to supervise or train claim, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer or employee was performing; (2) the inadequate training resulted from the defendant's deliberate indifference; (3) the inadequacy caused the injury. *Ellis v. Cleveland Municipal Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010) (quotation marks and citations omitted)). Where failure to train and supervise claims are not couched as part of a pattern of unconstitutional practices, "a municipality may be held liable only where there is essentially a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

17

Plaintiff has not alleged any past instances of unconstitutional conduct.  As a result, any failure-to-train or failure-to-supervise claims against Macomb County fail as a matter of law. Additionally, as Plaintiff seems to concede in his response, Macomb County provided corrections officers with training in how to respond to seizures.  (Pl.'s Resp. 10; Cleland Dep. 17-21.)  Deputy Cleland testified that he was taught that the primary concern in responding to a seizure is making sure that the inmate does not hurt himself.  (*Id.* at 19.)  While Plaintiff argues that Macomb County did not appropriately train its officers in the proper restraint (or lack thereof) of an inmate who just suffered a seizure, it cannot honestly be said that the incompleteness of such training was "so reckless or grossly negligent" that future misconduct "is almost inevitable or would properly be characterized as substantially certain to result.  *See Hays*,  668 F.2d at 874.  Accordingly, Defendants are entitled to summary judgment with respect to such claims.

### c.        Cleland's Deliberate Indifference

Even assuming that Plaintiff has established a genuine issue of material fact exists regarding whether Cleland was deliberately indifferent to Plaintiff's serious medical needs, such a finding would not be sufficient to hold Macomb County liable unless Plaintiff establishes that Cleland was acting in accordance with a specific County policy, practice, or custom which was the "moving force" behind Plaintiff's injuries. *See Graham*, 358 F.3d at 383.  Because Plaintiff has made no such allegations, Macomb County is entitled to summary judgment with respect to this claim.

### B.        Deliberate Indifference of the Individual Employees[6]

---

[6] The Court again notes that Plaintiff has not formally named any of the individuals he claims were deliberately indifferent to the risk he would have a seizure in his Complaint.  At oral argument the parties and the Court discussed the ramifications of this fact.  Defendant Macomb County's counsel argued that he did not represent Deputy Cleland because Cleland had not been served by Plaintiff despite the fact that specific allegations had been levied against him in

A state official's deliberate indifference to a substantial risk of serious harm violates the Eight Amendment's prohibition on the wanton infliction of pain as punishment. *See Farmer v. Brennan*, 511 U.S. 825, 829 (1994). Deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835. The test for determining whether an officer was deliberately indifferent has both a subjective and an objective component. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

The objective component is satisfied if the plaintiff alleges that the medical need at issue is sufficiently serious. *Id.* at 702-03 (quoting *Farmer*, 511 U.S. at 834). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004).

To satisfy the subjective criterion, the plaintiff must demonstrate that "the official being sued

---

Plaintiff's response and Cleland had been deposed, and therefore the claims against the individuals were not properly before the Court. (Mot. for Summ. J. Hr'g Tr. 5-6, May 20, 2011.) In response, Plaintiff's counsel stated:

> To the extent, Your Honor, we named John Doe Defendants and identified them in the Complaint as officers or agents of Macomb County correctional and law enforcement officers or deputies, we didn't know Mr. Cleland's identity at the time we served the Complaint. I'd ask for leave to amend the Complaint to conform to the proofs in this case which we have undertaken during discovery and identified Deputy Cleland as the one who struck and handcuffed Mr. Fisher after he had a seizure.

(Hr'g Tr. 6.) The Court granted leave to amend stating "[i]f you want to file something after the hearing, you can[,]" and asked the parties to discuss the individual would-be Defendants' liability during oral argument. (*Id.*) Plaintiff still has not amended his Complaint to name the individual employees as Defendants, so these claims are not technically before the Court. Even if they were, however, for the following reasons the Court concludes the individual employees would be entitled to summary judgment.

subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. It is not enough for the plaintiff to allege that the officer should have recognized a serious medical risk existed. *See Farmer*, 511 U.S. at 838 ("But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."). The United States Supreme Court has said that recklessly disregarding a known medical risk satisfies this requirement. *Id.* at 839-40. Although the subjective component requires a finding of something more blameworthy than negligence, "it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result" *Id.* at 835.

An official "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844; *see also Comstock*, 273 F.3d at 706; *Harrison v. Ash, Co.*, 539 F.3d 510, 519 (6th Cir. 2008) ("Oke reasonably responded to Jones' serious medical needs by contacting the nursing staff . . . . Consequently, Oke is entitled to qualified immunity.").

There is no denying that Plaintiff's seizure disorder satisfies the objective component of the *Farmer* test. As a result, the only issue is whether Plaintiff has presented evidence from which a reasonable jury could infer that Defendants subjectively realized that condition and unreasonably deliberately disregarded the risks associated with having a seizure disorder. The Sixth Circuit has instructed that "the subjective component of a deliberate indifference claim must be addressed for each officer individually." *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 542 (6th Cir. 2008) (quoting *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)) (quotation marks

and brackets omitted).  Plaintiffs may present general allegations, however, to prove that each
individual defendant had the requisite mental state for a deliberate indifference claim.  *Id.*

### 1.    Nurse Holmes

Nurse Holmes was the intake nurse who performed Plaintiff's medical screening when he
was first booked at the MCJ on January 10, 2008.  During the screening, Plaintiff told Holmes that
he had a seizure disorder and was prescribed two medications daily, Tegretol XR and Keppra.  He
also told her that the pharmacy he ordered his medications from was at Costco on Hall Road in
Shelby Township.

In accordance with CMS's policy, Holmes attempted to verify Plaintiff's medications by
calling Costco that day and filling out a CMS/Macomb County Jail Medication Confirmation Form.
(CMS's Br. Ex. A, MCJ Records, at 176.)  After speaking with Costco, Holmes determined that
Plaintiff had been prescribed Tegretol and Keppra but that he had not filled his prescription for
Tegretol since October 26, 2007 or for Keppra since July 26, 2007.  (*Id.*)  Records obtained from
Costco confirmed that Plaintiff received 30 days' worth of Keppra on July 26, 2007 and 12 days'
worth of Tegretol on October 26, 2007.  (CMS's Br. Ex. B.)  Although Plaintiff's doctor had
prescribed two refills for the Tegretol prescription, Plaintiff did not pick up Tegretol from Costco
again until November 19, 2008.  (*Id.*)  Because Holmes determined that Plaintiff would have run out
of both medications well before January 10, 2008 had he been taking them as prescribed, she
concluded that under CMS's policy Plaintiff's prescriptions were not current.  (Holmes Dep. 23:22-
24:20.)  Accordingly, she conferred with Dr. Bedia, who instructed her to place Plaintiff on the
clinic call list to see him the next day.  (*Id.* at 25:18-26:20.)  Additionally, Holmes ordered Plaintiff
to be placed on a lower bunk – a standard procedure for inmates at risk of having a seizure.  (*Id.* at

19:7-20.)

Holmes admitted that she did not put down that Plaintiff suffered from a seizure disorder on his intake chart, despite the fact that she ordered the lower bunk and physician referral. (*Id.* at 26:20-24.) Furthermore, she did not go back into Plaintiff's medical records from the MCJ even though she checked the box indicating that Plaintiff had been incarcerated at the MCJ before, nor did she attempt to find out whether Plaintiff had been hoarding medication or going to another pharmacy to fill his prescriptions.[7] (*Id.* at 25:9-15, 30:15-18.)

The Court finds that, at worst, Plaintiff's allegations with respect to Nurse Holmes amount to negligence and, therefore, cannot support a claim for deliberate indifference. Although Plaintiff's neurologist Dr. Belkin stated in his affidavit that the prescriptions he wrote for Plaintiff were valid through February 2008, (Belkin Aff. ¶ 8), there was no way for Holmes to know that. There is no evidence that Plaintiff gave Holmes Dr. Belkin's contact information, and even if he did Holmes' failure to follow up would only constitute negligence (or possibly medical malpractice).

Ultimately, even though it can be argued that Plaintiff faced a serious medical risk if he did not receive his medications and that Holmes was aware of this risk, the Court holds she would be entitled to summary judgment had she been a named Defendant because she responded reasonably to Plaintiff's risk. She attempted to verify that Plaintiff's medications were current. When she could not do so, she contacted Dr. Bedia (a step, the Court notes, she would have taken regardless), who instructed her to place Plaintiff on his clinic list so he could evaluate Plaintiff the next day. Even

---

[7] Plaintiff testified that he likes to get his medications as soon as possible so that he can stock up in order to avoid running out like that one time in November of 2002 or 2003. (Fisher Dep. 134:7-11.) However, there is no evidence that he relayed this information to Nurse Holmes.

assuming *arguendo* that Holmes was negligent in performing Plaintiff's medical screen or verifying his prescriptions, Plaintiff's deliberate indifference claims against Holmes fail as a matter of law.

### 2.   Dr. Bedia

After instructing Holmes to place Plaintiff on the clinic call for the next day after she was unable to verify Plaintiff's prescriptions for Tegretol and Keppra were current, Dr. Bedia examined Plaintiff on January 11, 2008 at 1:40 p.m.  When Dr. Bedia filled out the "Chronic Care Clinic Documentation" form (CMS's Ex. A, at 171-73) at 1:48 pm, he indicated that Plaintiff had a seizure disorder and prescribed Tegretol and Keppra while checking the "continue current therapy" box under the section titled "Plan." (*Id.* at 36:12-39:5.)  The doctor testified that someone who is prescribed Tegretol and Keppra must take them everyday.  (*Id.* at 48:8-11.)  He further stated that it would be possible, but not certain, for a person to get a seizure for missing one or two days of their medication.  (*Id.* at 52:20-53:4.)  Dr. Bedia testified that he did not think it was necessary to make sure Plaintiff was given his medications immediately on January 11, however, because he did not seem like he was having a problem.  (*Id.* at 41:12-19.)  Plaintiff's vital signs were stable, and there were no indications of an aura – a sign of an impending seizure.  (*Id.*)  As a result, Plaintiff was scheduled to first receive his medication during the next medication pass at 10:00 p.m. that night.  Plaintiff suffered a seizure sometime around 8:15 p.m. that evening.

Although it appears that Dr. Bedia was negligent in not providing Plaintiff with his medication earlier, the Court holds that his actions cannot support a claim for deliberate indifference.  Indeed, the facts presented make it clear that Dr. Bedia did not disregard the risk that Plaintiff would suffer a seizure.  When Plaintiff's medications could not be verified as current, Dr. Bedia scheduled to evaluate Plaintiff the next day and ordered the medications Plaintiff sought.  Although Plaintiff

claims that Dr. Bedia acted with deliberate indifference to the risk that he might have a seizure before receiving his medication at 10:00 p.m, the evidence shows that he was not indifferent to this risk. He testified that he did not think he needed the medication immediately because he was not exhibiting any signs that a seizure was imminent. (Bedia Dep. 41:12-19.) Plaintiff's vital signs were stable, and there were no signs of an aura. (*Id.*) Accordingly, although Dr. Bedia's actions ultimately did not prevent Plaintiff's seizure, and perhaps even constituted medical malpractice, they do not allow a reasonable jury to infer that he was deliberately indifferent to Plaintiff's serious medical needs. *See Graham*, 358 F.3d at 385 ("[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law.") (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)) (quotation marks omitted).

### 3.    Deputy Cleland

Plaintiff claims that Deputy Cleland was deliberately indifferent to Plaintiff's serious medical needs because Cleland knew Plaintiff was suffering or had just suffered a seizure; he knew from his training that seizure victims are at risk of hurting themselves due to their involuntary movements; and he "disregarded that risk by striking Mr. Fisher and placing him in steel handcuffs." (Pl.'s Resp. 11-12.) For the following reasons, the Court finds that no reasonable jury could find that Cleland was deliberately indifferent to Plaintiff's serious medical needs.

Although Cleland admitted that he was responding to a seizure, Cleland testified that when he arrived he did not believe that Plaintiff was experiencing a seizure. (Cleland Dep. 28:7-9.) Cleland stated that he had seen others suffer from seizures in the past, and that in his experience he did not believe that Plaintiff was currently seizing when he got to D-block. (*Id.* at 28:7-29:5.) Even

if Cleland *should* have realized that Plaintiff was having a seizure, Cleland could not be deliberately indifferent to the serious medical risk of restraining someone having a seizure in handcuffs when he did not think Plaintiff was having a seizure. Accordingly, even though Cleland is not a named Defendant, if he were, he would be entitled to summary judgment.

### C.    Gross Negligence

In his Complaint, Plaintiff accuses all Defendants of being grossly negligent but fails to identify which allegations he associates with which Defendants. Among Plaintiff's claims are accusations that Defendants failed to become "competently and adequately trained, educated and supervised" with respect to treating persons suffering from epilepsy; failing to provide Plaintiff with his seizure medications; and failing to provide Plaintiff with proper medical care during and after an epileptic seizure. (Compl. ¶ 69.) Plaintiff also alleges that Defendants were negligent in failing to recognize he was having a seizure and "[a]llowing Macomb County deputies, officers and other defendant personnel to violently attack [Plaintiff] during his epileptic seizure." (*Id.* ¶ 70.) Because Defendants' responses to these claims are different for Defendant Wayne County and Defendant CMS, their arguments will be addressed separately.

### 1.    CMS

CMS argues that Plaintiff's gross negligence claims should be dismissed because such claims are really medical malpractice claims and Plaintiff has not met Michigan's mandatory filing requirements. (CMS's Br. 21.) Michigan law imposes certain statutory requirements upon plaintiffs bringing medical malpractice claims. *See* Mich. Comp. Laws § 600.2912. "A complaint cannot avoid the application of the procedural requirements of a malpractice action by couching its cause of action in terms of ordinary negligence." *Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich.

25

26, 43 (1999) (quoting *McLeod v. Plymouth Court Nursing Home*, 957 F. Supp. 113, 115 (E.D. Mich. 1997)) (quotation marks omitted).  Plaintiff concedes that he has not complied with these requirements but argues that they do not apply because his claims sound in negligence, not malpractice.  (Pl.'s Resp. 16.)  The Court agrees with CMS, and holds that Plaintiff's gross negligence claims against CMS, Dr. Bedia, and Nurse Holmes sound in medical malpractice. Accordingly, they must be dismissed due to Plaintiff's admitted failure to satisfy Mich. Comp. Laws § 600.2912.

There are two aspects that distinguish medical malpractice claims. *Bryant v. Oakpointe Villa Nursing Ctr.*, *Inc.*, 471 Mich. 411, 422 (2004). First, medical malpractice can only arise "within the course of a professional relationship." *Id.* (quoting *Dorris*, 460 Mich. at 45). The Michigan Supreme Court has defined a professional relationship as one in which "a licensed health care professional, licensed health care facility, or the agents or employees of a licensed health care facility, were subject to a contractual duty that required that professional, that facility, or the agents or employees of that facility, to render professional health care services to the plaintiff." *Id.*

Second, a medical malpractice claims necessarily "raise questions involving medical judgment." *Id.* (quoting *Dorris*, 460 Mich. at 45). "If the reasonableness of the health care professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence." *Id.* at 423. If, however, "the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved." *Id.* Allegations regarding staffing decisions and patient monitoring often involve questions of professional medical management that are not considered matters jurors can judge by their common

knowledge and experience. *Id.* at 426 (quoting *Dorris*, 460 Mich. at 46).

However, not all matters in this area require expert testimony. For example, a claim that the defendants did *nothing* in response to a known risk could be evaluated based on common experience if it was clear that something should have been done. *Id.* at 430 (holding that plaintiff's claim that defendants did nothing to rectify risk of decedent asphyxiating herself between bed rails and bedding after they found her tangled the day before she died was a claim sounding in negligence). While cases differentiating between medical malpractice and negligence claims often involve hospitals or nursing homes, this analysis for distinguishing such claims has also been applied to allegations of gross negligence by corrections officers. *See, e.g.*, *Valarie v. Mich. Dep't of Corr.*, No. 2:07-cv-5, 2009 WL 2232684, at *21 (W.D. Mich. July 22, 2009).

In *Hartzell v. City of Warren*, No. 252458, 2005 WL 1106360 (Mich. App. May 10, 2005), the Michigan Court of Appeals held that the plaintiff's claim that CMS, Dr. Bedia, and another CMS nurse negligently treated him when he was incarcerated at the MCJ sounded in medical malpractice and not negligence. *Id.*, at *10. In *Hartzell*, the incarcerated plaintiff had a history of hypertension and had recently had a craniotomy. *Id.* The court found that lay jurors would not know what the appropriate treatment for such an inmate would be without the aid of expert testimony. *Id.* In overturning the trial court's decision, the *Hartzell* court held that "[b]ecause expert testimony would be needed to establish the standard of care required by a hospital and its employees, the claims brought by plaintiff are claims of medical malpractice." *Id.*

Plaintiff argues that Holmes, Dr. Bedia, and CMS's decision to deny him his medications after they confirmed he had a prescription for them "is not one that requires a specialized degree of training that is typically held by medical professionals." (Pl.'s Resp. 17.) Plaintiff attempts to

27

characterize these Defendants' actions as simply "administrative function[s]" that are within the common knowledge and experience of the jury. (*Id.*) The Court, however, disagrees.

To begin with, *Valarie* and *Hartzell* demonstrate that CMS and its staff have a professional relationship with inmates at the MCJ. Accordingly, the only question the Court must answer is whether jurors could evaluate Defendants' actions without reference to expert testimony. The Court holds that they could not. First off, the Court notes that with respect to the issue of causation both parties have already submitted affidavits of medical experts, Dr. Belkin for Plaintiff and Dr. Leutcher for Defendants. (Pl.'s Resp. Ex. 2; CMS's Br. Ex. K.) These experts offer conflicting opinions regarding whether Plaintiff's recorded Tegretol levels indicate that Defendants' failure to provide Plaintiff with his medications caused Plaintiff's seizure, or whether it would have likely occurred either way. (*Id.*)

While this fact alone would preclude the Court from finding that Plaintiff's claims are properly characterized as gross negligence, other factors evidence that the allegations sound in medical malpractice. For example, Plaintiff claims it was grossly negligent to allow the MCJ deputies to restrain Plaintiff while he was having a seizure. (Compl. ¶ 70.) While it may be within the jury's knowledge to know that someone having a seizure should not be put in handcuffs, Defendants deny that Plaintiff was experiencing a seizure when they arrived. (Cleland Dep. 28:7-9; Busby Dep. 25:17-28:24.) Defendant would need to provide expert medical testimony regarding what constitutes a seizure, what symptoms someone having a seizure would exhibit, and how to account for any discrepancies between Defendants' account of how Plaintiff acted during the alleged seizure and traditional behavior of a seizure victim. Accordingly, the Court finds that Plaintiff's claims for gross negligence against CMS, Dr. Bedia, and Nurse Holmes are actually medical

malpractice claims. As a result, Defendants are entitled to summary judgment because Plaintiff has admitted that he failed to comply with Michigan's statutory requirements for medical malpractice claims.

### 2.   Macomb County

Defendant Macomb County argues that it is immune from liability for Plaintiff's state law claims under the Government Tort Liability Act ("GTLA"), Mich. Comp. Laws § 691.1407 ("Section 7"). (Macomb's Br. 14.) In the GTLA, the Legislature clearly stated, "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if [it] is engaged in the exercise or discharge of a governmental function." *Mack v. City of Detroit*, 467 Mich. 186, 195 (2002) (quoting §1407(1)). As a result, an agency is immune unless the GTLA specifically permits a civil suit by citizens. *Id.* In *Mack*, the Michigan Supreme Court identified five exceptions to governmental immunity for an agency. *Id.* at 195 n.8. They are the "highway exception," Mich. Comp. Laws § 691.1405; the "motor vehicle exception," § 1405; the "public building exception," § 1406; the "proprietary function exception," § 1413; and the "governmental hospital exception," § 1407(4). *Id.* The Legislature has also codified one other exception, the "sewage disposal system event exception." § 1416.

The plaintiff must plead facts in avoidance of governmental immunity. *Mack*, 467 Mich. at 204. Plaintiffs can accomplish this "by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a non-governmental or proprietary function. *Id.* A "governmental function" is anything that is expressly or impliedly authorized by state law. *Id.* (quoting Mich. Comp. Laws § 691.1401(f)). In *Mack*, the court held that the management and operation of a police department was a well-

29

established government function.  *Id.*  Similarly, operating a jail is a government function.  As a result, because Plaintiff has not alleged that his claims fall within one of the statutory exceptions, the Court finds that Macomb County is immune from Plaintiff's state-law claims.

### D.    Assault and Battery

Plaintiff claims that all Defendants, with the exception of CMS, assaulted him.  (Count IV.)  Specifically, Plaintiff alleges that "[w]ith the tacit approval of Defendants Macomb County and the Sheriff's Department, John Doe Defendants deliberately and intentionally attacked, battered and assaulted Mr. Fisher while Mr. Fisher suffered a highly traumatic epileptic seizure."  (Compl. ¶ 73.)  Because Plaintiff has dismissed all claims against the Sheriff's Department and Sheriff Hackel, and because the Court has already held that Macomb County is immune from Plaintiff's state-law claims, all that is left of this Count is Plaintiff's claims against the John Doe Defendants.  Because neither Macomb County or CMS's motions addressed this claim on behalf of the John Doe Defendants,  it is not now before the Court.  To the extent that Plaintiff seeks to pursue this claim against Cleland, the Court reiterates that he has not been named in the Complaint or served by Plaintiff and therefore is not a party to this lawsuit.  *See supra* note 6.

### E.    Intentional Infliction of Emotional Distress

To establish a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must prove: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress."  *The Detroit News, Inc. v. Duran*, 200 Mich. App. 622, 629-30 (1993) (citing *Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985)).  "The trial court must determine as a matter of law whether the defendant's conduct was so extreme and outrageous to withstand a motion for summary disposition."  *Id.*  Liability will only be found when the defendant's

conduct is so outrageous and extreme that it goes beyond all bounds of decency and is "to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v. Mills*, 212 Mich. App. 73, 91 (1995) (citing *Linebaugh v. Sheraton Mich. Corp.*, 198 Mich. App. 335, 342 (1993)). The conduct must make the average member of the community exclaim "Outrageous!" when described to her. *Id.*; *see also Roberts*, 422 Mich. At 603.

In *Garretson*, the Sixth Circuit held that the plaintiff's allegations that police officers denied her insulin which resulted in her being hospitalized and treated for diabetic ketoacidosis the next day were insufficient to sustain a claim of IIED. 407 F.3d at 799. The court stated "Garretson has not offered proof that the officers *intended* to subject her to emotional distress by specifically denying her medical treatment. Nor has she shown that by allegedly neglecting her medical care, officers would expect her to experience emotional distress." *Id.* (emphasis in original).

In the instant case, Defendants' conduct was even less outrageous than that of the defendants in *Garretson*. Whereas in that case the officers allegedly did nothing upon learning that the plaintiff was a diabetic, here it is clear that Defendants did not ignore Plaintiff's request for his seizure medications. Although he ultimately did not receive them as quickly as he needed them, that was because Holmes believed that he did not have a current prescription for them and Dr. Bedia did not believe he was at risk of having a seizure immediately on January 11, 2008 at 1:40 p.m. Although Holmes may have been negligent in her execution of CMS's verification policy, her actions do not amount to the type of outrageous conduct necessary to establish an IIED claim. The same is true for Dr. Bedia's conduct. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's claims for IIED.

**IV.     Conclusion**

For the reasons stated above, the Court GRANTS Defendants' motions for summary judgment in their entirety.

**SO ORDERED.**


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 14, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on June 14, 2011.


S/Denise Goodine
Case Manager